## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**CARA GIBSON,**
*Administratrix of the Estate of*
*David Thomas Gibson,*

:

           **Plaintiff,**           **Case No. 2:21-cv-4588**
                                  **Judge Sarah D. Morrison**
      **v.**                    **Magistrate Judge Elizabeth A.**
                                    **Preston Deavers**

**MATT CHAMPLIN,** *et al.*,

:

           **Defendants.**

### OPINION AND ORDER

Tommy Gibson was booked into the Gallia County Jail on September 8, 2019.
On September 14, he hung himself from the bars of his cell with a County-issued
blanket. Tommy's widow, Cara, filed suit seeking to hold the County liable for
Tommy's death. (*See* Am. Compl., ECF No. 4.)

The matter is now before the Court on three motions: a Motion for Summary
Judgment (Mot., ECF No. 63); a Motion for Leave to File Surreply (ECF No. 81);
and a Motion for Leave to File Supplemental Authority (ECF No. 84). The latter two
(ECF Nos. 81, 84) are **GRANTED**. The first requires more discussion.

## I.    BACKGROUND

### A.    Tommy was booked into the Gallia County Jail.

David Thomas Gibson went by Tommy. By age 27, Tommy had a wife, two
children, and a drug addiction. He was arrested on September 8, 2019, after his wife

and mother filed complaints alleging that his drug abuse had led to violence. (*See* ECF No. 63-1, PAGEID # 774–78, 804–06.)

Tommy was booked into the Jail by Officer Cheyenne Rucker. (Champlin Dec., ECF No. 63-1, ¶ 6.) Officer Rucker completed a Medical Questionnaire that asked about Tommy's drug use and suicide risk. (ECF No. 63-1, PAGEID # 792; *see also id.*, PAGEID # 887.) According to the questionnaire, Tommy reported no drug or alcohol use, no depression, no history of self-harm, and no suicidal thoughts. (*Id.*, PAGEID # 792–93.)

The Jail has four housing units for male inmates: Blocks A, B, C, and D. (Brumfield Dep., ECF No. 70, 40:11–13.) Tommy was initially housed in A Block. Jonathan Sammut, another inmate in A Block, had gone to school with Tommy. (Sammut Dep., ECF No. 69, 12:10–19.) According to Mr. Sammut, Tommy came into the Jail with "emotions . . . running wild." (*Id.*, 15:14–25.) Tommy was also sick, "sweating a lot," "complaining of a headache," and "in and out of the bathroom, diarrhea." (*Id.*, 16:25–17:2.) Mr. Sammut testified that Tommy asked a "heavyset" corrections officer[1] "if he could get something for his head. He told him he'd see what he could [get]. Never came back." (*Id.*, 17:12–15, 20:12.) After shift-change, he

---

[1] Mr. Sammut described the first officer as heavyset with short, dark hair, tattoos, glasses, and a mustache. (Sammut Dep., 20:12–21:4.) Ms. Gibson does not argue that any of the Individual Defendants match this description.

recalls that Tommy asked a "thinner" officer[2] for medicine for diarrhea, headache, and depression. (*Id.*, 17:17–22.) The thinner officer told Tommy

> he didn't know what to tell him, he didn't have any medicine for him, that there was no medicine listed on his file, so they wasn't going to give him anything.

(*Id.*, 17:23–18:2.) Finally, Mr. Sammut testified that Tommy spoke with Officer Brooklyn Stapleton[3] about "getting him something at least for the diarrhea and the vomiting. But it never came of anything." (*Id.*, 31:20–32:3.)

Mr. Sammut was released from Gallia County Jail on September 10, 2019. For the two days that their detention overlapped, Mr. Sammut watched Tommy suffer from illness and depression without aid. (*Id.*, 33:18–24.)

### B. Tommy's mother raised alarms about his mental health on September 13, 2019.

Around noon on September 13, 2019, Tommy called his mother, Sherry Russell. (Russell Dep., ECF No. 57, 32:7.) Tommy admitted that he had been abusing Suboxone and methamphetamine when he assaulted her days before. (*Id.*, 33:13–16.) Tommy's mother is a nurse, and he told her that he had not been given any withdrawal medications. (*Id.*, 33:9–13.) Tommy also admitted to Ms. Russell that he was contemplating self-harm. (*Id.*, 34:10.) When Ms. Russell hung up the phone, she called Sheriff Matt Champlin, with whom she had a long personal and

---

[2] Mr. Sammut described the second officer as about 5'7" and built with dark hair and tattoos on his arms. (Sammut Dep., 23:1–24.) Ms. Gibson does not argue that any of the Individual Defendants match this description.

[3] Officer Stapleton denies that this interaction occurred. (*See* Stapleton Dec., ECF No. 63-5 ¶ 15.)

professional relationship, and told him that Tommy was suicidal; she asked him to help Tommy get medical attention. (*Id.*, 36:3, 9–11.) Sheriff Champlin said he would. (*Id.*, 36:22–37:5.)

Sheriff Champlin then directed Lieutenant Kevin Werry to have Tommy evaluated by the Jail's mental health provider, Hopewell Health Centers. (Champlin Dec., ¶ 12.) Lieutenant Werry, who was not on-site, called the Jail. (Werry Dec., ECF No. 63-3, ¶ 7.) Officer Debra Smith received the call and arranged an evaluation. (Smith Dep., ECF No. 55, 95:15–96:2.)

## C. Tommy was evaluated by the Jail's mental health provider, Hopewell Health Centers.

By the time Officer Smith called Hopewell, Tommy had been moved to D Block.[4] (*See* Stapleton Dec., ¶¶ 9, 13.) "D Block is an isolation cell where [an inmate] with a medical, behavioral, or mental health issue can be housed and monitored more closely[.]" (*Id.*, ¶ 16.) D Block includes a bed, a small table, and a toilet with a sink. (Phillips Dec., ECF No. 77-2.) There are two doors to D Block: the first is a solid metal door that opens into the hallway; the second is a door of metal bars. (*Id.*) Between the two doors is a small vestibule with a surveillance camera facing the inmate's living quarters, but a belligerent inmate had recently broken D Block's camera and light fixture. (*Id.*; Bennett Dep., ECF No. 74, 87:9–19, 91:21–25.) So, when Tommy was there, the only available light came from the fluorescent fixtures

---

[4] Nothing in the record establishes who moved Tommy to D Block, when, or why. This move should have been noted in the Jail logs. (Champlin Dep., ECF No. 68, 92:2–3.)

on the hallway ceiling. If the solid metal door leading to the hallway was closed, Tommy would have been in complete darkness.

Officer Smith went to D Block to tell Tommy that someone from Hopewell would be coming to speak with him. (Smith Dep., 96:3–6.) Tommy did not react, "[h]e just looked at [her]." (*Id.*, 107:12–16.) Officer Smith's shift ended before anyone from Hopewell arrived. (*Id.*, 102:23–24.) She briefed Officer Stapleton before departing. (*Id.*, 102:24–25.)

Rebecca Ashburn, a Chemical Dependency Counselor Assistant for Hopewell Health Centers, arrived at the Jail in the evening hours of September 13, 2019. (Ashburn Dep., ECF No. 60, 31:1–3.) She was escorted to D Block, where she found Tommy sitting on his bunk. (*Id.*, 34:9.) Tommy told Ms. Ashburn that he was upset that his family had not bonded him out. (*Id.*, 35:13–14.) Ms. Ashburn observed that Tommy was "a little agitated." (*Id.*, 35:6.) She described the 45-minute-long evaluation in deposition:

> He was very polite, very well-mannered young man. His biggest thing was that he wanted his family back, and he knew that they—that he had to get the help he needs. He denied any mental health treatment before. He denied any substance abuse treatment, not the use, but he's never went to treatment before. He said he'd been in the jail for already a week, could I please just call his mom and ask his mom to pay his bond to get out.

> . . . He did hold my hand and thank me for coming in and talking to him. And at the time, when I seen him, he denied any suicidal thoughts, denied any hearing voices or seeing things, denied having a plan. He said he had them earlier but didn't really narrow it down when they were. And so we discussed a safety plan on, you know, if the thoughts come back, let the [officers] know, I'll come back and see you. And he— at the end he shook my hand once again and thanked me very much for coming and seeing him and stated that he felt better.

(*Id.*, 37:25–38:24.)

Ms. Ashburn told the officers to "leave him in D Block because he was getting a withdrawal pack[,]" and she planned to have the Hopewell on-call follow-up with him the next day. (*Id.*, 39:6–11.) She left a copy of her report at the Jail. It says:

> Client is a 28 years old caucasin male being seen on emgerency at the Gallia County Jail. Client states no mental health issues or family history. Client substance use is subutex and marjuana. Not a good relastionship with family right now do to his substance use. Client states that he has had sucial thought but no plan at this time. Client states he feels anxitiy and depressed to being in Jail. Client did receive a withdraw packet for Jail N.P. Client state that he need to get out to get help.
>
> . . .
>
> Client has commited to a stafey plan.
>
> . . .
>
> Leave in D Block for 24 hour for withdraw medication to work per jail policy.

(ECF No. 63-1, PAGEID # 811 (reproduced as written).)

Jail policy provides that any inmate "identified as having the potential to become suicidal while in custody" will be placed on Close Watch, with physical checks every 15 minutes and clothes and blankets removed in favor of a suicide-resistant vest. (ECF No. 63-1, PAGEID # 919-20; Werry Dec., ¶ 18.) But after he was seen by Ms. Ashburn, Jail Officers believed that Tommy had been "cleared" and did not require any special watch. (*See, e.g.*, Rectenwald Dep., ECF No. 73, 23:22–24:1; Bennett Dep., 104:17–20.) As a result, Tommy was treated like any other inmate: they checked on him once every hour, he wore an orange jumpsuit, and he had a blanket.

6

### D.     Tommy also began to receive withdrawal medications.

Tommy's withdrawal pack was delivered to the Jail by Health Department

Medical Assistant Casey Roush. (Alvaro Dep., ECF No. 61, 50:19–24.) Officer

Michael Fink administered the first doses to Tommy at 5:00pm and 9:00pm on

September 13.[5] (ECF No. 63-1, PAGEID # 817; *see also* Fink Dec., ECF No. 63-7,

¶ 12.)

### E.     In the early hours of September 14, 2019, Tommy asked to call his wife.

Officer Andrew Rectenwald began his shift at 11:00pm on September 13,

2019. (Rectenwald Dec., ECF No. 63-2, ¶ 7.) Tommy was asleep in D Block and did

not appear to be in any distress. (Rectenwald Dep., 15:11–12.) Officer Rectenwald

testified:

> About 1:30 in the morning, I do remember [Tommy] woke up and wanted
> to make a phone call. I believe it was to his victim. I know he was in for
> a domestic assault. And I advised him, no, that we don't bring people out
> to booking, you know, after business hours or whatever and we can't be
> making calls to a victim. And that was the only time that he was awake
> the whole shift.

(*Id.*, 15:13–21.) When asked how Tommy responded to his request being denied,

Officer Rectenwald said:

> He wasn't upset at all. He wasn't in distress. He wasn't upset. When I
> told him no, he said, okay. He said, I understand. He laid back down in
> his rack, and he covered back up and went back to sleep. When I checked

---

[5] The Health Department medical records indicate that Tommy was
prescribed clonidine, ondansetron, hydroxyzine, and dicyclomine. (*See* ECF No. 63-
1, PAGEID # 815.) The Jail's Medication Administration Record, however, shows
that Tommy was given clonidine, ondansetron, hydroxyzine, quetiapine, and
cyclobenzaprine. (*Id.*, PAGEID # 817.)

on him a little bit later, he was alseep. He wasn't mad. He didn't throw
nothing. He didn't get mad at me, cuss me out, nothing like that.

(*Id.*, 18:23–19:7.)

But there is some indication that the night was not as peaceful as Officer
Rectenwald remembered. Deputy Amanda Brumfield testified that the now-
deceased Officer Carol Braley told her that Tommy was yelling through the night,
which caused someone to close the outer metal door to D Block with Tommy inside.
(Brumfield Dep., 57:3–13.) No other deponent recalled the outer door being closed.
(*See, e.g.*, Rectenwald Dep., 20:4–17; Bennett Dep., 74:1–5; Stapleton Dep., 19:17–
25.)

## F.    Tommy attempted suicide on September 14, 2021. He later died of his injuries.

The next morning, Tommy's father, Chris, came to visit him at the Jail. (*See*
ECF No. 63-1, PAGEID # 976.) Officer Emerson Hunter Bennett escorted Tommy to
and from visitation. According to Officer Bennett, Tommy was polite and respectful.
(Bennett Dep., 71:22–72:1, 75:12–21.) But Mr. Gibson recalled that Tommy
appeared "haggard," "angry and agitated" during the visit. (Gibson Dec., ECF No.
77-4, ¶ 4.) Tommy told his father "that he had been taken out of one hole and been
placed into a deeper, darker, hole." (*Id.*, ¶ 5.) Mr. Gibson understood the "darker
hole" as a reference to the light in D Block. (*Id.*) Mr. Gibson ended his visit early
because he did not want to cry in front of Tommy. (*Id.*, ¶ 7.)

An hour after the visit with his father ended, Tommy was found hanging in
his cell. (ECF No. 63-1, PAGEID # 880.) He had twisted his blanket into a noose.
Officer Bennett put his arms through the cell bars to hold Tommy up to relieve

8

pressure on his neck. (Bennett Dec., ECF No. 63-9, ¶ 21.) An inmate ran for help. (*Id.*, ¶ 22.) Officer Braley used scissors to cut the blanket. (*Id.*, ¶ 24.) Officer Bennett performed chest compressions before Tommy was taken to the hospital. Tommy died of his injuries.

## II.    PROCEDURAL BACKGROUND

Two years after his death, Cara Gibson filed suit on behalf of herself, her children, and Tommy's estate. (ECF No. 1.) The operative Amended Complaint asserts federal constitutional and state-law claims against Gallia County and several of its officials. (Am. Compl.) Before reaching the merits of the suit, several claims and parties require attention.

### A.    Pseudonymous Defendants

The Amended Complaint names twenty-one pseudonymous Defendants: CO-15, John/Jane Doe Supervisors #1–10, and John/Jane Doe Corrections Officers #1–10. (Am. Compl.) Ms. Gibson has not moved to substitute the real names of those Defendants, nor has she effected service upon them as required by Federal Rule of Civil Procedure 4(m). Accordingly, all claims against CO-15 and the Doe Defendants are **DISMISSED** for failure to timely effect service of process.

### B.    Officer Carol Braley

On July 27, 2023, Defendants notified the Court and all parties of the death of Defendant Officer Carol Braley. (ECF No. 42.) The parties then had 90 days to file a motion for substitution. Fed. R. Civ. P. 25(a)(1). No such motion was filed, so "the action . . . against the decedent must be dismissed." *Id.*; *see also Boyd v. Smith*, No. 2:12-CV-814, 2014 WL 1050080, at *2 (S.D. Ohio Mar. 14, 2014) (dismissing

claims against deceased defendant where "six months ha[d] passed since the filing of the suggestion of death, and no motion for substitution ha[d] been filed"). All claims against Officer Braley are thus **DISMISSED**.

### C. Officer Christopher Queen

Finally, Ms. Gibson concedes that "the evidence compiled through discovery does not create a genuine issue of material fact on" Officer Christopher Queen's involvement in the events surrounding Tommy's death. (Resp., ECF No. 77, PAGEID # 2202.) Defendants' Motion for Summary Judgment is thus **GRANTED** as to Officer Queen.

### D. Official Capacity Claims

A lawsuit brought against a public official in his or her official capacity is treated as a suit against the government entity — the real party in interest. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). To prove liability, then, a plaintiff must prove that the entity's policy or custom caused the constitutional injury. *Id.* The same standard is used to prove municipal liability. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). "Courts regularly dismiss as redundant claims against agents in their official capacities when the principal entity is also named as a defendant in the suit." *Johnson v. Washington Cnty. Career Ctr.*, No. 2:10-CV-076, 2010 WL 2570929, at *4 (S.D. Ohio June 22, 2010) (citing *Von Herbert v. City of St. Clair Shores*, 61 F. App'x 133, 140 (6th Cir. 2003)); *see also Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 327 (6th Cir. 2013) (concluding that an official capacity suit against a township's agent was "superfluous" because the township was also named as a defendant). Because Ms.

Gibson names Gallia County as a Defendant, her official capacity claims against the remaining County officials (Sheriff Champlin, Lieutenant Werry, Chief Deputy Johnson, and Officers Fink, Clay, Stapleton, Rectenwald, and Bennett) are redundant. Those official capacity claims are **DISMISSED**.[6]

*         *         *

After dismissing the pseudonymous defendants, the official capacity claims, and Officer Braley, and granting summary judgment to Officer Queen, these claims and defendants remain:

**Count I: Deprivation of Due Process (U.S. CONST. amend XIV)**

*Deliberate Indifference Theory* – Lieutenant Werry, Chief Deputy Johnson, and Officers Fink, Clay, Stapleton, Rectenwald, and Bennett, each in their individual capacity

*Failure to Implement Policy/Train/Supervise Theory* – Gallia County

**Count II: Wrongful Death (Ohio Rev. Code § 2124.02)**

Lieutenant Werry, Chief Deputy Johnson, and Officers Fink, Clay, Stapleton, Rectenwald, and Bennett, each in their individual capacity

**Count III: Gross Negligence (Ohio common law)**

Lieutenant Werry, Chief Deputy Johnson, and Officers Fink, Clay, Stapleton, Rectenwald, and Bennett, each in their individual capacity

**Count IV: Loss of Consortium (Ohio common law)**

Lieutenant Werry, Chief Deputy Johnson, and Officers Fink, Clay, Stapleton, Rectenwald, and Bennett, each in their individual capacity

(Am. Compl.)

---

[6] Because Sheriff Champlin was only sued in his official capacity, this dismisses him from the action.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

12

IV.    **ANALYSIS**

A.    **Count I: Federal Constitutional Claim**

In Count I of the Amended Complaint, Ms. Gibson alleges that Gallia County, along with, in their individual capacities, Lieutenant Werry, Chief Deputy Johnson, and Officers Fink, Clay, Stapleton, Rectenwald, and Bennett (the "Individual Defendants"), violated Tommy's Fourteenth Amendment rights by exhibiting deliberate indifference to his serious medical needs.

1.    **Ms. Gibson concedes that the Individual Defendants (except Officer Rectenwald) are entitled to summary judgment on Count I.**

The Individual Defendants raise a qualified-immunity defense to Ms. Gibson's deliberate indifference claim. "When the defendant raises qualified immunity, the plaintiff bears the burden of proving that the defendant is not entitled to summary judgment." *Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008). Qualified immunity is intended to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Accordingly, "it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

An official is entitled to qualified immunity so long as he has not violated a "clearly established statutory or constitutional right[] of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). The analysis is two-pronged: Courts must determine first whether the facts make out a violation of a constitutional right and, second, whether that right was clearly established at the

time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "These two prongs may be addressed in any order. If either prong is not met, then the government officer is entitled to qualified immunity." *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018) (citation omitted).

Ms. Gibson contends that the Individual Defendants were deliberately indifferent to Tommy's serious medical condition while he was detained. Both convicted prisoners and pretrial detainees have "a constitutional right to be free from deliberate indifference to their serious medical needs." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 310 (6th Cir. 2023). For prisoners, this right arises under the Eighth Amendment, which prohibits "cruel and unusual punishments." *Greene v. Crawford Cnty., Mich.*, 22 F.4th 593, 605 (6th Cir. 2022) (quoting U.S. CONST. amend. VIII). For pretrial detainees, the right derives from the Fourteenth Amendment's Due Process Clause. *Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 566 (6th Cir. 2020). For many years, this was a distinction without a difference—courts in this circuit analyzed both pretrial detainees' and prisoners' deliberate indifference claims "under the same rubric," requiring a plaintiff to establish both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021) (citation omitted). To satisfy the objective component, a plaintiff needed to show an "objectively" serious medical need. *Farmer*, 511 U.S. at 834. To meet the subjective component, a plaintiff had to prove that an officer (i) subjectively knew of facts that created a substantial risk of serious harm to the inmate, (ii) subjectively concluded that the

14

substantial risk of serious harm existed, and (iii) responded unreasonably to that risk. *Lawler v. Hardeman Cnty., Tenn.*, 93 F.4th 919, 926–27 (6th Cir. 2024) (citing *Farmer*, 511 U.S. at 837); *Campbell v. Riahi*, No. 23-3793, 2024 WL 3565391, at *3 (6th Cir. July 29, 2024) (citing *Farmer*, 511 U.S. at 835).[7]

Then in 2015, the Supreme Court considered a similar framework in the context of excessive force claims. *See Kingsley v. Hendrickson*, 576 U.S. 389 (2015). The Court concluded that, in that context, a pretrial detainee need demonstrate "only that the force purposely or knowingly used against him was objectively unreasonable," while a prisoner must prove both objective <u>and subjective</u> unreasonableness. *Id*. at 396–97, 400–02. The Sixth Circuit subsequently brought *Kingsley* into the deliberate indifference rubric, thereby lowering the subjective showing required to succeed on such claims brought by pretrial detainees. *Brawner*, 14 F.4th at 596 ("Given *Kingsley*'s clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment, applying the same analysis to these constitutionally distinct groups is no longer tenable."). Now, a "pretrial detainee must prove more than negligence but less than subjective intent—something akin to reckless disregard" to succeed on a deliberate indifference claim. *Id*. (internal quotation marks omitted); *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 316 (6th Cir. 2023) ("Simply put, *Brawner* held that *Kingsley* required us to lower the

---

[7] The Sixth Circuit recommended *Campbell v. Riahi* for publication; the decision has not yet appeared in the Federal Reporter, 4th.

15

subjective component from actual knowledge to recklessness."), *cert. denied*, 144 S. Ct. 692 (2024).

But that is not the end of the story. Earlier this year, in *Lawler v. Hardeman County, Tennessee*, the Sixth Circuit counseled that, until *Brawner* was decided, *Farmer* was the "only clearly established law" applicable to a pretrial detainee's deliberate indifference claim. 93 F.4th at 927–28. As a result, for actions arising before *Brawner* was decided in 2021, a court must apply the higher actual-knowledge standard from *Farmer* to determine if an officer is entitled to qualified immunity. *Id*.

The Sixth Circuit decided *Lawler* shortly after briefing on the instant Motion closed. (*See* ECF No. 84.) In her Supplemental Memorandum in Opposition to Defendants' Motion for Summary Judgment, Ms. Gibson "concedes that the *Lawler* case supports granting summary judgment to" all remaining Individual Defendants except Officer Rectenwald. (ECF No. 85, PAGEID # 2435.) Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to the individual capacity claims against Lieutenant Werry, Chief Deputy Johnson, and Officers Fink, Clay, Stapleton, and Bennett, each in their individual capacity.

### 2. Officer Rectenwald is entitled to summary judgment on Count I.

As a caveat to her concession, Ms. Gibson argues that Officer Rectenwald is not entitled to qualified immunity, even under the higher *Farmer* standard. (*Id*.) She asserts that Officer Rectenwald knew of facts that "made it 'obvious' that a strong likelihood existed that [Tommy] would commit suicide." (*Id*., PAGEID # 2436

16

(citing *Lawler*, 93 F.4th at 929 (quoting *Farmer*, 511 U.S. at 842)).) The record shows that Officer Rectenwald knew that Tommy (i) was in D Block; (ii) was on medications for withdrawal, even though he was not showing any signs or symptoms of active withdrawal; (iii) had been evaluated by Hopewell, but was not placed on suicide watch; and (iv) asked to call his wife (the victim of his charged domestic assault offense) in the middle of the night. No reasonable jury could find that this collection of facts made Tommy's suicide an obvious risk.

Ms. Gibson argues that Officer Rectenwald knew about Ms. Russell's report to Sherriff Champlin, and had reason to doubt Hopewell's assessment—in part because Tommy admitted to Ms. Ashburn that he had, at one time, had a suicide plan. (ECF No. 85, PAGEID # 2437.) But there is no evidence that Officer Rectenwald knew about Ms. Russell's report or the contents of Ms. Ashburn's assessment.[8] *See Greene*, 22 F.4th at 607 (explaining that the subjective prong of the deliberate indifference analysis must look at each defendant individually, such that knowledge cannot be imputed from one defendant to another).

Officer Rectenwald is thus entitled to qualified immunity on Ms. Gibson's deliberate indifference claim; Defendants' Motion for Summary Judgment is **GRANTED** to that extent.

---

[8] Ms. Gibson also argues that Officer Rectenwald knew about the distressing tenor of Tommy's visit with his father because "the records or debriefings must have included" that information. (ECF No. 85, PAGEID # 2437.) But Tommy's father visited the jail two hours <u>after</u> Officer Rectenwald's shift ended on September 14. (*See* Rectenwald Dep., 24:9–11; ECF No. 63-13, PAGEID # 976.)

### 3. Gallia County is also entitled to summary judgment on Count I.

Counties may not be held vicariously liable under § 1983 for the actions of their employees or agents. *Monell*, 436 U.S. at 694. A county can be held directly liable only when "an officially executed policy, or the toleration of a custom . . . leads to, causes, or results in the deprivation of a constitutionally protected right." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 690–91). Ms. Gibson bases her § 1983 claim against Gallia County on allegations that Jail policy caused a failure to mitigate the risk of Tommy's suicide. (Resp., PAGEID # 2204–06.) Her Amended Complaint asserts that Gallia County (through Sheriff Champlin and Lieutenant Werry) "fail[ed] to adopt policies, train, and/or supervise" Jail officials in investigating, monitoring, and reporting on inmates' medical conditions, and transporting inmates for advanced medical care. (Am. Compl., ¶ 56.) But Ms. Gibson seems to have abandoned the failure-to-train and supervisory-liability theories in favor of a claim focused on liability for failure to adopt and implement effective policies. (Resp., PAGEID # 2204–06.)

A county's failure to act may be a basis for municipal liability when those "failures amount[] to 'a policy of deliberate indifference' to [the plaintiff's] constitutional rights." *Campbell*, 2024 WL 3565391, at *5 (quoting *Claiborne Cnty.*, 103 F.3d at 508). But "a municipality cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established." *Campbell*, 2024 WL 3565391, at *5 (quoting *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994–95 (6th Cir. 2017)). Because the

18

Individual Defendants did not violate a clearly established right, it follows that their employer, Gallia County, was not deliberately indifferent to such a right. *Id*. Gallia County is entitled to summary judgment on Count I.

## B. Counts II, III, IV: State Law Claims

In Counts II, III, and IV, Ms. Gibson asserts wrongful death, gross negligence, and loss of consortium claims against the Individual Defendants. Ohio law generally shields municipal employees from such claims, with three exceptions.[9] Relevant here, statutory immunity will not apply when the municipal employee's acts or omissions were "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b).

Ms. Gibson argues that the Individual Defendants acted in a reckless manner and are thus not entitled to statutory immunity. As the Sixth Circuit recently explained,

> an officer acts in a reckless manner when she consciously disregards or is indifferent towards "a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." That definition creates "rigorous standards" that are "difficult to establish[.]"

*Campbell*, 2024 WL 3565391, at *6 (quoting *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016)). The question thus becomes whether any of the Individual Defendants acted in a manner that "was so 'perverse' as to amount to 'substantially greater

---

[9] Ms. Gibson also argues that Gallia County is not entitled to statutory immunity. However, Ms. Gibson did not assert any state-law claims against Gallia County. (*See* Am. Compl., ¶¶ 57–62.) Even if she had, Ohio Rev. Code § 2307.60 does not expressly impose civil liability on political subdivisions themselves. *See Hale v. Toth*, Nos. 112030, 2023 WL 5444109, at *8 (Ohio Ct. App. Aug. 24, 2023), *appeal denied*, 223 N.E.3d 1260 (Table) (Ohio 2023).

than negligent conduct.'" *Id*. (quoting *A.J.R. v. Lute*, 168 N.E.3d 1157, 1161–62 (Ohio 2020)).

Ms. Gibson recites each Individual Defendant's involvement in the surrounding circumstances and argues that each perversely ignored the obvious risk of Tommy's suicide. But no reasonable jury could make such a finding.

*Lieutenant Werry*. On September 13, Ms. Russell called Sheriff Champlin and told him that Tommy was depressed and suicidal. Sheriff Champlin then called Lieutenant Werry and asked him to have Tommy evaluated by Hopewell. Lieutenant Werry then called the Jail and directed Officer Smith to arrange the evaluation. When Lieutenant Werry next spoke to the Jail, he was told that Tommy had been evaluated and that Hopewell concluded that, while he was not suicidal, he should stay in D Block.

It is unclear whether Lieutenant Werry told Officer Smith that there was a specific concern that Tommy was suicidal. Even if he omitted that detail, the Court cannot conclude that Lieutenant Werry acted recklessly—he directed Officer Smith to have Tommy evaluated by the Jail's mental health provider, who did not recommend suicide watch. *Howell*, 67 F.4th at 315 (explaining that non-medically trained officers can reasonably defer to a medical professional's opinion, although such deference is not absolute or indefinite).

Ms. Gibson further argues that Lieutenant Werry "condoned the use of a non-medical screener and Defendants' obliviousness to what she learned[,]" but there is no evidence that Lieutenant Werry knew anything about Ms. Ashburn's credentials

or the details of her assessment. Lieutenant Werry was, at most, negligent in failing to learn those details.

*Chief Deputy Johnson*. Chief Deputy Troy Johnson performed CPR on Tommy after his noose was severed. Ms. Gibson asserts that he was also responsible for the Jail facilities, including the inoperable camera and light fixture in D Block.[10] The camera had broken on September 8, 2019, after an inmate struck it with a trash can. The same inmate broke the light. Assuming that was his responsibility, Chief Deputy Johnson was, at most, negligent in failing to repair those facilities more quickly.

*Officer Fink*. Officer Fink worked from 3:00pm to 11:00pm on September 13, 2019. He knew that Tommy was in D Block, but did not know why. Although Officer Fink was on duty when Tommy was evaluated by Ms. Ashburn, he did not speak with about her assessment or conclusion. Officer Fink also administered Tommy's withdrawal packet, which had been hand-delivered by the Health Department. Although the medications administered were not the medications prescribed, there is no evidence that Officer Fink was aware of, let alone responsible for, the discrepancy.

*Officer Clay*. Officer Misty Clay was not on duty when Tommy was booked or when he attempted suicide. (Clay Dec., ECF No. 63-8, ¶¶ 6–7.) Officer Clay knew that Tommy was in D Block for withdrawal, but she did not observe him in any

---

[10] Chief Deputy Johnson's Declaration states that he "do[es] not have any involvement in the day-to-day operations of the Gallia County Jail." (Johnson Dec., ECF No. 63-4, ¶ 6.) This dispute is not material to the resolution of the claim.

distress at any time. (*Id.*, ¶¶ 12, 14.) Officer Clay conducted regular check-ins on Tommy while he was in D Block, and she knew that the camera in D Block was not operational. There is no basis to find that a corrections officer acts recklessly by placing a detainee in an observation cell without a working camera when that detainee is not visibly in distress and the corrections officer conducts regular observations of the detainee.

*Officer Stapleton*. Officer Stapleton also knew that Tommy was in D Block— she brought him dinner on September 13, 2019, and observed him lying down. Although Officer Stapleton was on duty when Ms. Ashburn evaluated Tommy, creating a possibility that she could have interrogated Ms. Ashburn's assessment, there is no evidence that Officer Stapleton facilitated the evaluation or interacted with Ms. Ashburn in any way.

*Officer Rectenwald*. The Court has already concluded that Officer Rectenwald did not act with conscious disregard. Ms. Gibson argues that Tommy's mid-night request to call her (his wife and victim of his domestic assault charges) should have raised alarm bells for Officer Rectenwald. But without any other indicia of trouble, the Court cannot conclude that Officer Rectenwald *recklessly* failed to recognize that Tommy was suicidal. *Cf. Cooper v. Cnty. of Washtenaw*, 222 F. App'x 459, 470–71 (6th Cir. 2007) (concluding that an inmate's outfit and housing assignment did not make it obvious that inmate was on suicide watch when both the outfit and housing assignment had an "explanation . . . besides the suicide watch explanation").

*Officer Bennett.* Officer Bennett was on duty when Tommy attempted suicide. At the beginning of his shift, he was told that Tommy was in D Block because he was detoxing. Officer Bennett was also told that Tommy had been evaluated by Hopewell, but had not been placed on suicide watch. Officer Bennett escorted Tommy to and from the visitation bay. While escorting another inmate to visitation, Officer Bennett found Tommy hanging in his cell. Officer Bennett reached through the bars of the cell door to relieve pressure on Tommy's neck and called for help. When Tommy was cut down, Officer Bennett began chest compressions.

Ms. Gibson argues that Officer Bennett was willfully blind to an obvious risk—that he "must have known" that the camera was not functioning, "the cell was pitch black," that "Tommy was only being sporadically monitored" even though he was detoxing; and that he "must have observed the emotional fragility Tommy had . . . displayed to his father" during their notably brief visit. (Resp., PAGEID # 2201.) Officer Bennett admitted in deposition that he knew the camera was broken, but explained that a camera is helpful only when an officer is able to monitor the feed (which, that morning, he was not). (Bennett Dep., 95:1–18.) He also knew that the light was broken, but testified that it was "not pitch dark" and that he "had plenty of light to do what [he] needed to do, plenty of light to see [Tommy]" and "plenty of light to cut him down." (*Id.*, 68:6–20.) Officer Bennett followed Jail policy on the frequency of physical checks of Tommy. And, finally, he found nothing remarkable about Tommy's affect after visitation, except for how "polite" and "respectful" Tommy was.

23

*     *     *

Ms. Gibson's arguments, though cogent and moving, "come with the benefit of hindsight, as well as a degree of reflection." *Campbell*, 2024 WL 3565391, at *6. But "the standard for proving recklessness is high," and she cannot persuade a reasonable jury that any of the Individual Defendants' conduct "was so perverse as to amount to recklessness under Ohio law." *Id*. The Individual Defendants are thus entitled to statutory immunity on Counts II, III, and IV.

## V.     CONCLUSION

For the reasons above, Ms. Gibson's Motion for Leave to File Surreply (ECF No. 81) and Defendants' Motion for Leave to File Supplemental Authority (ECF No. 84) are **GRANTED**. Ms. Gibson's claims against Corrections Officers Doe #1-10, Supervisors Doe #1-10, CO-15, and Officer Carol Braley are **DISMISSED**. Ms. Gibson's Official Capacity claims against the Individual Defendants are also **DISMISSED**. Finally, Defendants' Motion for Summary Judgment (ECF No. 63) is **GRANTED** as to all remaining claims.

The Clerk is **DIRECTED** to **TERMINATE** this case.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**